IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 86553-6-I |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| DAMON R. BOYLES, | |
| Appellant. | |

BOWMAN, A.C.J. — A jury convicted Damon R. Boyles of unlawful imprisonment and assault in the fourth degree. Boyles appeals the unlawful imprisonment conviction, arguing sufficient evidence does not show he restrained Amy Benesh with knowledge that he had no legal authority to do so. Because sufficient evidence supports the conviction, we affirm.

FACTS

Benesh lives in California but came to Seattle to celebrate her birthday. On October 11, 2022, Benesh was sightseeing near Miner's Landing at Pier 57. That evening, she planned to catch a ferry back to West Seattle. She needed to use a restroom but could not find any public facilities nearby. So, she decided to relieve herself behind a set of dumpsters near the pier. Boyles, a security guard for Miner's Landing, saw Benesh enter a section of Pier 57 that was generally off-limits to the public. He followed her to investigate.

Boyles "almost stepped" on Benesh as she squatted behind the dumpster, which startled both of them. Benesh immediately put up her hand in response, and Boyles thought she was "intentionally grabbing towards [his] crotch," which made him "scared and angry." So, he grabbed Benesh's outstretched arm "really, really hard" and pulled her shoulder, which caused her to fall to the ground while her pants were still down. While Benesh was facedown on the ground, Boyles turned on his body camera, handcuffed her hands behind her back, and then pulled up her pants. The body camera footage captured Boyles angrily cursing at Benesh.

Boyles called his partner, James Pindell, who arrived as Boyles began to move Benesh away from the dumpsters. Benesh kept saying she had done nothing wrong and asking Boyles what he was doing. Boyles called Benesh derogatory names and replied, "I'm ruining your whole fucking day."

Boyles "dragged" Benesh through the Miner's Landing property to an alcove on the opposite side of the pier. Along the way, Benesh continuously screamed at Boyles, and she repeatedly called for help and said "ow." Boyles continued to curse at Benesh, telling her, "I don't give a fuck," and calling her a "stupid bitch." Benesh kept falling to the ground and lost her right shoe and sock at some point. At the alcove, Boyles shoved Benesh headfirst into the wall. Then he grabbed Benesh by the neck, yelled at her, and threw her to the ground.[1] Benesh tried to leave the alcove several times but Boyles repeatedly shoved her back in.

Benesh's screaming and "pleading for help" alerted bystanders, including Amanda Perez and Daniel Ramos. Perez saw Boyles "dragging" Benesh by the

---

[1] Testimony at trial described Boyles as "somersault[ing]" Benesh over his leg into the alcove. Boyles told officers that he gave her "a mild leg sweep."

2

handcuffs.  She saw him throw Benesh into the wall of the alcove and force her to the ground.[2]  Perez also heard Boyles threaten Benesh that he had pepper spray and thought to herself, "oh my God, this is about to escalate again."  Ramos confronted Boyles and urged him to release Benesh.  A shouting match ensued between Boyles and Ramos, and Boyles threatened Ramos that he had "another pair of handcuffs."  He also told bystanders to get off the pier.

Boyles called the police to report that he had detained Benesh.  Pindell observed that Boyles was visibly angry and encouraged him to "catch [his] breath" and "take a walk" to cool off.  But Boyles refused.  Soon after, Boyles turned off his body camera, which had been recording for almost 10 minutes.

Ramos also called the police, concerned by Boyles' "aggressive" behavior toward Benesh.  Police arrived about an hour after Boyles' call.  When they arrived, Benesh was still in handcuffs and Boyles was still yelling at her.  The officers immediately separated the two.  Boyles told Seattle Police Officer Beck Davis and Officer Kyle Corcoran that he had detained Benesh for public urination.

Officer Oliver Murphy tried to remove the handcuffs from Benesh but struggled for about 30 seconds because they were "too tight."  Officer William Griffin noted visible injuries to Benesh's wrists caused by the restraints.  Benesh appeared hysterical.  She was hyperventilating and pleading with the officers to keep Boyles away from her.  Emergency responders treated Benesh at the scene and took her to the hospital for additional care.  Officer Corcoran arrested Boyles.

---

[2] Perez also testified that Boyles "flipp[ed] [Benesh] off very aggressively in her face." Boyles' body camera footage corroborates this, and then he tells Benesh to "[s]hut up, bitch" and laughs at her.

On February 13, 2024, the State charged Boyles with unlawful imprisonment and assault in the fourth degree. At trial, the State presented testimony from several police officers and other eyewitnesses. Benesh also testified. She explained that during the incident, she felt "absolutely terrif[ied]," and that she still has lasting physical injuries to her wrists. Finally, Boyles testified in his own defense. He said he handcuffed Benesh because he believed she was attacking him. He also testified that he detained Benesh because he believed urinating in public is a crime. But on cross-examination, he testified that he was unsure whether public urination is a crime.

The State argued in closing that Boyles detained Benesh because he was angry with her, not because he believed she committed a crime. It argued Boyles "knew what he was doing was unlawful, because there is a difference between acting out of authority and acting out of anger. Mr. Boyles was acting out of anger."

The jury found Boyles guilty of unlawful imprisonment and assault in the fourth degree.[3] The trial court granted Boyles' request for a first-time offender waiver on the unlawful imprisonment conviction and sentenced him to 30 days of community restitution with credit for 1 day served in jail.[4]

Boyles appeals.

### ANALYSIS

Boyles argues that insufficient evidence supports his conviction for unlawful imprisonment. Specifically, he contends no evidence shows that he knew he lacked legal authority to detain Benesh. We disagree.

---

[3] Boyles does not appeal his conviction for assault in the fourth degree.

[4] The court imposed a 364-day suspended sentence with 1 day in jail, 240 community service hours, and 24 months' probation on the fourth degree assault conviction.

We review a challenge to the sufficiency of the evidence de novo. *State v. Hummel*, 196 Wn. App. 329, 352, 383 P.3d 592 (2016). To determine whether sufficient evidence supports a conviction, we view the evidence in a light most favorable to the State and consider whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. DeJesus*, 7 Wn. App. 2d 849, 882, 436 P.3d 834 (2019). A sufficiency challenge admits the truth of the State's evidence and accepts the reasonable inferences made from it. *State v. O'Neal*, 159 Wn.2d 500, 505, 150 P.3d 1121 (2007). We defer to the fact finder on issues involving conflicting testimony, witness credibility, and the persuasiveness of the evidence. *DeJesus*, 7 Wn. App. 2d at 883.

Here, the trial court instructed the jury that to convict Boyles of unlawful imprisonment, the State must prove beyond a reasonable doubt that he restrained Benesh without her consent and that he "knew that such restraint was without legal authority." And in instruction 10, the court told the jury that a person knows or acts knowingly with respect to a fact when he is aware of that fact; and that

> [i]f a person has information that would lead a reasonable person in the same situation to believe a fact exists, the jury is permitted but not required to find that he or she acted with knowledge of that fact.

In a supplemental instruction,[5] the court also instructed the jury that when knowledge is required as part of an element of the crime,

> you must find the defendant had actual knowledge of that fact . . . beyond a reasonable doubt.

---

[5] The court issued the supplemental instruction in response to a jury question asking, "If a person has information that would lead a reasonable person in the same situation to believe that they are restraining without legal authority [d]oes jury instruction # 10 apply."

You may consider whether a reasonable person in the same situation would believe that a fact . . . exists as circumstantial evidence on the issue of whether the defendant had actual knowledge of that . . . fact.

Finally, the trial court instructed the jury that a private citizen has legal authority to detain another

for a criminal offense if it (1) constitutes a breach of the peace and (2) is committed in the private person's presence.
A breach of the peace is a public offense done by violence, or one causing or likely to cause an immediate disturbance of public order.

Viewing the evidence in a light most favorable to the State, a rational trier of fact could determine that Boyles knew he lacked legal authority to restrain Benesh. Boyles testified that after he almost stepped on Benesh, he handcuffed her because he saw her "hand coming up towards [his] groin." He explained that he was "scared and angry" because he "thought [he] was being attacked." So, he "grabbed the hand [and] pulled on the shoulder to start putting cuffs on." Yet he also testified that "[l]ooking back, I could see how maybe she was just startled." Boyles later testified that he detained Benesh because he believed she committed a crime by urinating in public. But on cross-examination, he said he was unsure whether urinating in public is a crime. From this evidence, a reasonable juror could conclude that Boyles detained Benesh because she startled and angered him, not because he believed she committed a crime.

Other evidence at trial corroborates that Boyles acted out of anger and in disregard of legal authority. Boyles' body camera footage shows him roughhousing Benesh and dragging her to the alcove. He repeatedly yelled at her, called her degrading names, and cursed at her. Indeed, when officers arrived an hour later, they could hear Boyles still yelling at her. Eyewitnesses, including Perez, testified that Boyles threw Benesh into the alcove wall, grabbed her by the neck, and threatened her

6

with pepper spray while she was already in handcuffs. Pindell recognized that Boyles was angry and told him to calm down, which Boyles refused to do. And Benesh testified she was "absolutely terrif[ied]" of Boyles and had lasting injuries caused by his actions.

Further, evidence introduced at trial showed Boyles' conduct conflicted with his training about how to behave when acting under lawful authority. Boyles acknowledged on cross-examination that his training manual instructs that he is "responsible for [a detainee]'s wellbeing" and ensuring they are not injured, and that he should engage with them as little as possible. But Boyles assaulted Benesh and yelled at her for over an hour.

Boyles argues the evidence shows he acted with a good faith belief that public urination is a crime. He compares his case to State v. Warfield, 103 Wn. App. 152, 5 P.3d 1280 (2000). In Warfield, three private citizens detained an individual based on an out-of-state misdemeanor warrant. Id. at 155, 154. But the warrant had no legal effect in Washington. Id. at 155. So, the State charged the defendants with unlawful imprisonment. Id. at 154. At trial, the parties stipulated that the defendants believed the warrant granted them legal authority to detain the victim. Id. at 155. Still, the trial court convicted the defendants as charged. Id. But on appeal, Division Two of our court reversed. Id. at 159. It concluded that "knowledge of the law is a statutory element of the crime of unlawful imprisonment, without proof of which, defendants' convictions cannot stand." Id. And it explained that the uncontroverted evidence showed the defendants believed they were acting lawfully because they had a warrant and that local law enforcement "appeared to ratify the lawfulness of their actions" Id.

This case is different from *Warfield*. Here, the parties did not stipulate that Boyles acted on a good faith belief that he had lawful authority to arrest Benesh. While Boyles testified that he acted in good faith, he also testified that he detained Benesh because she startled him. Other evidence also supported the State's argument that Boyles acted out of anger rather than a good faith belief he had lawful authority to detain Benesh. And, again, we defer to the trier of fact "to resolve conflicts in testimony, weigh evidence and draw reasonable inferences therefrom." *State v. Gerber*, 28 Wn. App 214, 216, 622 P.2d 888 (1981).

Because sufficient evidence supports the jury's determination that Boyles unlawfully imprisoned Benesh, we affirm.

_____, ACJ

WE CONCUR:

_____        _____
Colum, J.                      Mann, J.

8